Civil action for actionable negligence under Federal Employers' Liability Act.
Plaintiff was an employee of defendant as yard conductor at Weldon, and defendant is a common carrier by railroad, engaged in interstate commerce.
The defendant denied any negligence, and set up (1) contributory negligence; (2) assumption of risk.
The material facts, as testified to by plaintiff, on direct-examination, in substance: That he left the engineer and switchman in charge of the switch engine with headlight out and one box-car coupled to it, standing still on pass track, and told the switchman to stay there until No. 85, the through freight, pulled out of the yard. No. 85 and the switch engine and box-car were on parallel tracks. It was 325 feet from where the engine and box-car were on left standing to Poplar Street public crossing in Weldon, where plaintiff was injured. As No. 85 pulled on *Page 524 
down, plaintiff got up on the steps of the engine, just back of his switch train, and asked the engineer what orders he had for No. 82, the through train going north. This was done so that he could govern his movements in switching in the yard, so that No. 82 might not be delayed at the Weldon yard. This was in performance of his regular duty. He was standing on the engine step of No. 85, holding to grab-irons with lighted lantern in his left hand, talking to the engineer, and just as he got to Poplar Street crossing he stepped off the engine. The engineer of No. 85 hollered, "Look out!" and he glanced over his shoulder and saw the box-car of the switch train. He tried to save himself but was knocked face down and his leg mashed so that it had to be amputated. He heard no signal given by the switch engine approaching the crossing — no bell or whistle. The first knowledge he had that the switch engine crew had disobeyed orders was when the engineer of No. 85 hollered at him to "Look out." At the time the train hit him, no one from the switch engine gave him any warning. He had not heard it and when he glanced back he did not see any light on the end of the car or anybody there. He was hit by the box-car of the backing train on the pass track. There was nothing to prevent the switch engineer, if he was looking, from seeing him step down off of engine No. 85 when he reached Poplar Street crossing.
On cross-examination: "If I had looked back I would not have gotten off in front of it. If I had looked back and saw the train, of course I would not have been hurt. This is the evidence that I did not look back (exhibiting his injured leg) as I said before. I had told the train to stand still and I had no reason to look back. I was not expecting the train to move. I stepped off the moving engine and was looking in the direction in which the engine was moving. I could have seen this other train coming if I had looked. I don't know whether I could have seen it in time to have gotten out of the way. If I had looked back and seen the train coming, and if I had stayed where I was, I would not have been hurt. If I had looked back and seen this train I certainly would have stayed where I was. I had no occasion to look back though, because I relied upon my orders being obeyed. I had given orders for that train to remain where it was and I relied upon it standing still. . . . During the time I did not look back. It took some little time to step down between the tracks and to step across to the next track. I never looked back. When I was getting ready to step down off the engine, and when I was between the tracks, and when I started across the next track, I did not look back. My leg shows that I did not look back. I was not trying to get hurt. I had no occasion to be looking for a train. There was no other train on the yard at that time except the one I was riding on and my yard train. I had left my engine and car down the *Page 525 
track and had given orders for my train to stand still until No. 85 had pulled through and I was not expecting any. I was not paying any attention to my train, because I had already given attention to it. If my train had remained where I ordered it to remain, I would not have been hurt. . . . I am thoroughly familiar with the Weldon yard. I had worked there about two years before this time. I knew the yard very well. It was then just like it is now. . . ." On redirect-examination he testified: "The yard at Weldon is not in every respect a standard yard, the standard width between the centers of tracks is 14 feet. The distance between the main line and pass-track is about one foot eight and one-half inches short of standard." On recross-examination: "The tracks are just the same as I have been knowing them all these years. I knew how wide it was between the tracks just from looking at them. I had never measured them in my life until after I was hurt. I knew they were close together. . . . My feeling was terrible. When my leg was mashed, hardly know how to express it. I, of course, expected the train to kill me; I cannot express how I felt. When the wheel struck my leg it felt like a redhot burning sensation and that kept up for the first five days. I felt like I was standing in fire up to my knee. After the first five days I suffered practically all the time. I still suffer. I have the sensation of my toes being drawn back and my leg aching. It has affected my nervous system." Plaintiff was so mashed and mangled that his right leg had to be amputated about six inches below the knee.
Plaintiff introduced Rule 30 of Rule Book of Seaboard Air Line Railway Company, which is as follows: "The engine bell must be rung when the engine is about to move and while approaching and passing public crossings at grade and while passing stations."
Defendant offered in evidence Rule 103, as follows: "When cars are pushed by an engine, except when shifting or making up trains in yards, a trainman must take a conspicuous position on the front of the leading car, and when shifting over public crossings at grade not protected by a watchman, a member of the crew must protect the crossings. This will also apply to engine moving backward." And also part of General Rule M, as follows: "They (employees) must expect trains to run at any time, on any track, in either direction."
The issues submitted to the jury and their answers thereto, were as follows:
"1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: Yes.
2. Did the plaintiff, by his own negligence, contribute to his injury, as alleged in the answer? Answer: No.
3. Did the plaintiff voluntarily assume the risk of injury alleged in the answer? Answer: No. *Page 526 
4. What damages, if any, is the plaintiff entitled to recover? Answer: $35,000.00."
There was evidence supporting the contention of both sides of the controversy.
The other facts necessary and assignments of error will be considered in the opinion.
Under the Federal Employers' Liability Act, the jurisdiction of the courts of the United States is concurrent with that of the courts of the several states, and any case arising under the act and brought in any state court shall not be removable to any of the United States courts. The decisions of the Federal courts control over the State courts in all actions prosecuted in the State courts, but the rules of practice and procedure are governed by the laws of the states where the cases are pending.
Under the Federal Employers' Liability Act, in the present kind of action, the issues ordinarily submitted are (1) negligence; (2) contributory negligence; (3) assumption of risk; (4) damages.
"The first section of the Federal Employers' Liability Act provides that every common carrier by rail while engaging in interstate commerce, and while the servant injured or killed is employed in such commerce, is liable`for such injury or death resulting in whole or in part from the negligenceof any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, tracks, roadbed, works, boats, wharves or other equipments.' . . . The clause relating to negligence in the first section of the Federal Act has two branches; one governing the negligence of any of the officers, agents or employees of the carrier, which abolishes thecommon-law fellow-servant doctrine; and the other relating to defects and insufficiencies due to negligence in the railroad's rolling stock, machinery, track, roadbed, works, boats, wharves or other equipment. These two clauses, it has been held, cover any and all negligent acts of which the carrier could have been guilty under the common law." Roberts Injuries to Interstate Employees, pp. 18 and 19; Southwell v. R. R., 191 N.C. at p. 157.
The third section provides that contributory negligence shall not barrecovery, but shall only diminish the damages, except that no employee injured or killed where the violation of a safety law for employees contributed to the injury, shall be held to have been guilty of contributory negligence. *Page 527 
The fellow-servant doctrine has been abrogated by the United States statutes as to railroads engaged, as here, in interstate commerce. That question does not arise.
In Seaboard Air Line R. R. Co. v. Horton, 233 U.S. at p. 501 (58 L.Ed., p. 1069), Mr. Justice Pitney says: "This clause has two branches; the one covering the negligence of any of the officers, agents, or employees of the carrier, which has the effect of abolishing in this class of cases the common-law rule that exempted the employer from responsibility for the negligence of a fellow-employee of the plaintiff," etc. Reed v.Director-General of Railroads, 258 U.S. at p. 92 (66 L.Ed., p. 480).
Defendant moved for judgment as in case of nonsuit at the conclusion of plaintiff's evidence, and at the conclusion of all the evidence. C. S., 567.
On a motion to nonsuit, the evidence is to be taken in the light most favorable to plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.
The defendant contends, in support of these assignments of error, "that the sole proximate cause of the plaintiff's injury was his own negligence in stepping from the engine of train No. 85 into a place of safety between the tracks and then onto the pass-track without looking for an approaching train." Can the contention be sustained? If so, the nonsuit should have been granted. We cannot so hold.
The plaintiff was in a place he had a right to be. The two tracks were parallel and close together. He stepped off the engine at Poplar Street, a public crossing in Weldon. He was lulled into security and thrown off his guard as he had left the switch engine and box-car 325 feet from the crossing with positive orders not to move until the through train pulled out, and relied on his orders being obeyed. It was at night, 2:10 a.m. The box-car which struck him had no rear light on it or any person to warn any one at the public crossing of the approach of the backing switch engine and box-car on the pass track — no bell was rung or whistle blown. The engineer of the switch engine from his cab, if he had been keeping a proper lookout, saw, or in the exercise of ordinary care could have seen plaintiff on the steps of engine No. 85, and as a reasonably prudent man he could reasonably anticipate that injury or harm might follow his getting off the through train as it accelerated its speed in pulling out and the danger of the plaintiff in stepping in front of the backing train on the pass track at the Poplar Street crossing. These were, in substance, the allegations in plaintiff's complaint. They were denied by defendant, and the plea of negligence, contributory negligence and assumption of risk set up. The plaintiff's testimony and *Page 528 
other evidence sustained his contentions. The evidence of defendant's witnesses contradicted it. The jury found with the plaintiff.
Under the facts and circumstances of this case, we do not think that the failure of plaintiff in alighting from the engine of train No. 85, where he had a right to be, and stepping on the pass track at the public crossing, in close proximity and not looking back, negligence and the sole proximate cause of plaintiff's injury.
In International Stevedoring Co. v. Haverty, U.S. Supreme Court, opinion delivered 18 October, 1926, Mr. Justice Holmes says: "This is an action brought in a state court seeking a common-law remedy for personal injuries sustained by the plaintiff, the respondent here, upon a vessel at dock in the harbor of Seattle. The plaintiff was a longshoreman engaged in stowing freight in the hold. Through the negligence of the hatch tender no warning was given that a load of freight was about to be lowered, and when the load came down the plaintiff was badly hurt. The plaintiff and the hatch-tender both were employed by the defendant stevedore, the petitioner here, and the defendant asked for a ruling that they were fellow-servants and that therefore the plaintiff could not recover. The Court ruled that if the failure of the hatch-tender to give a signal was the proximate cause of the injury the verdict must be for the plaintiff. A verdict was found for him, and a judgment on the verdict was affirmed by the Supreme Court of the State. 134 Wn. 235, 245. A writ of certiorari was granted by this Court.269 U.S. 549." The petitioner disputed the common-law right to recover on account of the fellow-servant doctrine. That the case was governed by the Admiralty law that administered the common law. Under Act of 5 June, 1920, ch. 250, sec. 20, 41 Stat., 988, 1007, in substance, any seaman who shall suffer personal injury in the course of his employment shall have the same remedy in case of personal injuries to railway employees. "Stevedores" came under the act, and the judgment was affirmed.
The court below charged the jury correctly what was negligence, and as to negligence and proximate cause left it to the jury to ascertain the facts, and on proximate cause charged as follows: "It is necessary just here to define for you what is meant by proximate cause — what in law is meant by proximate cause. Two elements must be considered: first, negligence, and that such negligence was the proximate cause of the injury, and the burden is upon the plaintiff to satisfy you by the greater weight of the evidence that the defendant was negligent, and that such negligence was the proximate cause of the injury. I have defined for you what is meant by negligence, and I will now instruct you what is the legal definition of proximate cause. The proximate cause of an event must be understood to be that cause which is natural *Page 529 
and in continuous sequence, unbroken by any new and independent cause, produces that event, and without which it would not have occurred. It is the last negligent act without which the injury would never have occurred. It is the responsible cause. It is sometimes referred to by using two Latin words, causa causans, which means the immediate cause; the last link in the chain of causation." We can see no error in this charge to the prejudice of the defendant.
"It was said in Ordegard v. North Wisconsin Lumber Co., 110 N.W. 809, 818; 130 Wis., at p. 685: In an action for injuries to a servant, an instruction that `proximate' cause meant `the immediate, direct, actual, natural, efficient, and real cause,' was no ground for reversal of a judgment in favor of plaintiff, as it placed a heavier burden on him than the correct rule." Kepley v. Kirk, 191 N.C. at p. 695.
Mr. Justice Strong, in R. R. v. Kellogg, 94 U.S. p. 474, says: "The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. The primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied at the other end, that force being the proximate cause of the movement, or, as in the oft-cited case of the squib thrown in the market place. 2 Bl. Rep., 892. The question always is, Was there an unbroken connection between the wrongful act and the injury — a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? . . . We do not say that even the natural and probable consequences of a wrongful act or omission are in all cases to be chargeable to misfeasance or nonfeasance. They are not when there is a sufficient and independent cause operating between the wrong and the injury. In such a case the resort of the sufferer must be to the originator of the intermediate cause. But when there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect and proximate to it. The inquiry must, therefore, always be whether there was any intermediate cause disconnected from the primary fault and self-operating which produced the injury. . . . In the nature of things there is in every transaction a succession of events more or less dependent upon those preceding, and it is the province of the jury to look at this succession of events or facts and ascertain whether they are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time." *Page 530 
Again the same judge says in Ins. Co. v. Boone, 95 U.S. 117: "The proximate cause is the dominant cause, not the one which is incidental to that cause, its mere instrument, though the latter may be nearest in place and time to the loss. . . . `The inquiry must always be whether there was an intermediate cause disconnected from the primary fault and self-operating, which produced the injury.'" Harton v. Telephone Co.,141 N.C. 462-3; Taylor v. Lumber Co., 173 N.C. at p. 115; Construction Co.v. R. R., 184 N.C. p. 179; Hinnant v. Power Co., 187 N.C. 288; Mangumv. R. R., 188 N.C. 695; Paderick v. Lumber Co., 190 N.C. 312; Kepley v.Kirk, supra.
Cases denying a nonsuit under facts similar to the present action, are fully set forth in Moore v. R. R., 185 N.C. p. 189; S. c., 186 N.C. 257. See, also, Bradley v. R. R., 126 N.C. 735; Reid v. R. R., 140 N.C. 146;Norman v. R. R., 167 N.C. 533; Hudson v. R. R., 176 N.C. 488;Parker v. R. R., 181 N.C. 102; Bass v. R. R., 183 N.C. 444.
"If, however, there is no reason to apprehend the approach of cars an employee will not be held disentitled to recover by reason of the fact that he failed to look for trains before going on the tracks." 18 R. C. L., p. 668, part sec. 160.
In Wolfe v. R. R., 154 N.C. at p. 575, it is said: "The plaintiff was employed in a most dangerous work, requiring his almost constant presence on the tracks. Under such circumstances the defendant owed him the duty of active vigilance in giving warning of the approach of engines and trains, and the plaintiff had the right to rely upon the performance of this duty in discharging his own duty and caring for his personal safety." Sherrillv. R. R., 140 N.C. 252; Inman v. R. R., 149 N.C. 123; Zachary v. R. R.,156 N.C. 503.
In R. R. v. Koennecke, 239 U.S. p. 352: "We see equally little ground for the contention that there was no evidence of negligence. It at least might have been found that Koennecke was killed by a train that had just come in and was backing into the yard, that the movement was not a yard movement; that it was on the main track and that there was no lookout on the end of the train and no warning of its approach. In short the jury might have found that the case was not that of an injury done by a switching engine known to be engaged upon its ordinary business in a yard, like Aerkfetz v. Humphreys, 145 U.S. 418, but one where the rules of the company and reasonable care required a lookout to be kept. It seems to us that it would have been impossible to take the case from the jury on the ground either that there was no negligence or that the deceased assumed the risk. Upon a consideration of all the objections urged by the plaintiff in error in its argument *Page 531 
and in its briefs, we are of opinion that the judgment should be affirmed."Erie R. Co., v. Purucker, 244 U.S. p. 320.
As to the second issue, of contributory negligence, the defendant prayed the court to instruct the jury that upon all the evidence in the case they should answer the second issue "Yes." The court declined to do so and in this we think there was no error. The court charged as follows; "On this second issue, it is necessary that I again address myself to the word `negligence.' That means I must further instruct you in the law, because the negligence spoken of in this second issue — the negligence of the plaintiff — is called contributory negligence. I instruct you, gentlemen of the jury, that contributory negligence is the negligent act of a plaintiff which, concurring and cooperating with the negligent act of the defendant, is the proximate cause of the injury. The same rule of due care which the defendant is bound to observe applies equally to the plaintiff. There is really no distinction between negligence of the plaintiff and negligence of the defendant, except the plaintiff's negligence is called contributory negligence. The law further says, gentlemen, that contributory negligence may consist of some act of omission or act of commission. It is the lack of due diligence or the lack of due care in doing the wrong thing at the time and place, or in doing nothing when something should have been done. That is to say, did the plaintiff fail to exercise due care which an ordinarily prudent man would have exercised under similar circumstances, and was said failure so to do the proximate cause of his injury? As I stated to you heretofore, the defendant has the burden of proof, and if the defendant has satisfied you by the greater weight of the evidence that the plaintiff by his own negligence contributed to his injury, it would be your duty to answer the second issue, `Yes.'"
"Contributory negligence under the Federal Employers' Liability Act has been defined by the United States Supreme Court in the following language: `Contributory negligence involves the notion of some fault or breach of duty on the part of the employee, and since it is ordinarily his duty to take some precaution for his own safety when engaged in a hazardous occupation, contributory negligence is sometimes defined as a failure to use such care for his safety as ordinarily prudent employees in similar circumstances would use.' Seaboard Air Line Ry. Co. v. Horton,233 U.S. 492, 58 L.Ed., 1062. In another case before the Supreme Court of the United States the following definition of contributory negligence was approved: `Contributory negligence is the negligent act of a plaintiff which, concurring and cooperating with the negligent act of a defendant, is the proximate cause of the injury.' Norfolk W. R. Co. v. Earnest,229 U.S. 114, 57 L.Ed., 1096." Roberts, supra, p. 218, sec. 112. *Page 532 
The charge is substantially in the language of the rule as laid down inMoore v. Iron Works, 183 N.C. p. 438; Boswell v. Hosiery Mills,191 N.C. p. 549.
As to the third issue — assumption of risk — the defendant prayed the court to instruct the jury that upon all the evidence in the case they should answer the third issue "Yes."
In Reed v. Director General, supra, at p. 95, it is said: "In actions under the Federal Act the doctrine of assumption of risk certainly has no application when the negligence of a fellow-servant which the injured party could not have foreseen or expected is the sole, direct and immediate cause of the injury. To hold otherwise would conflict with the declaration of Congress that every common carrier by railroad while engaging in interstate commerce shall be liable to the personal representative of any employee killed while employed therein when death results from the negligence of any of the officers, agents or employees of such carrier."
"A freight conductor did not assume the risk of the negligence of a flagman working under him who failed to protect the rear of the train."Penn. Ry. Co. v. Goughnor, 126 C.C.A., 39, 208 Fed., 961; Roberts, supra, p. 205; Chesapeake O. Ry. Co. v. DeAtley, 241 U.S. 310
(60 L.Ed., 1016); Boldt v. Penn. Ry. Co., 245 U.S. 441 (62 L.Ed., 385).
In Chicago, Rock Island Pacific Ry. Co. v. Ward, 252 U.S. p. 18
(64 L.Ed., 434), it is said: "It was a sudden emergency, brought about by the negligent operation of that particular cut of cars, and not a condition of danger, resulting from the master's or his representatives' negligence, so obvious that an ordinarily prudent person in the situation in which Ward was placed, had opportunity to know and appreciate it, and thereby assume the risk."
The court gave full instructions on assumption of risk and was, perhaps, more liberal to defendant than it was entitled to under the facts and circumstances of this case. The jury passed on the facts and answered the issue "No," and we can see no error in the charge.
On the fourth issue, as to damages, the court below charged: "I instruct you that in an action for damages for injury caused by negligence, the plaintiff would only be entitled to recover what sum of money, paid at the present time, in a lump sum, would represent the reasonable present value
of his diminished power in the future and the difference between what he would have been able to earn in the future but for such injury, and the sum he will be able to earn in the future in his present condition. (The latter part shows that diminished power meant earning power.) A man 46 years old may be expected to live 23 8/10 years. These figures, gentlemen of the jury, are taken from the mortuary tables of life insurance companies. They do not control, *Page 533 
that is, upon the question of the determination of human life figures do not control; they are not given to control you, but merely to guide you. They are based upon the law of averages, and there is no certainty that any person will live the average duration of life, because a man may live longer or less time than the average. I instruct you, gentlemen of the jury, that the plaintiff, if he be entitled to recover at all, would be entitled to recover as damages or compensation in a lump sum for all injuries, past and prospective, as a result of the defendant's wrongful and negligent acts. This may embrace loss of time, loss of ability to perform physical labor or decreased capacity to earn money. That is, if you are satisfied by the greater weight of the evidence that the plaintiff is entitled to recover, he would be entitled for loss of both bodily and mental powers, for inconvenience and humiliation because of the loss of his leg in consequence of his injuries."
We think the above charge is borne out in Fry v. R. R., 159 N.C. 361;Johnson v. R. R., 163 N.C. 431; Hill v. R. R., 180 N.C. 490; Ledford v.Lumber Co., 183 N.C. 614; Strunks v. Payne, 184 N.C. 582; Shipp v.Stage Line, ante, 475.
In a case of wrongful death, arising under the Federal Employers' Liability Act, and in such cases arising under the State law, there is a marked distinction. See Carpenter v. Power Co., 191 N.C. 130. The present action is not for wrongful death, but in Chesapeake O. R. Co. v. Kelly,241 U.S. p. 485, wrongful death case, the present value, or present worthrule, is recognized.
The Federal Employers' Liability Act provides that contributory negligence shall not bar recovery, but shall only diminish the damages, etc. On this aspect, the charge was full and accurate and no exception taken. We have discussed only what we consider the main assignments of error; the others we do not consider material or present any novel or serious questions of law. Upon the whole record we can find no prejudicial or reversible error.
No error.