This is an action for actionable negligence brought by plaintiff against defendant. The defendant denied negligence and also set up the plea of assumption of risk and contributory negligence. The evidence of *Page 399 
plaintiff was to the effect: That he worked on the Asheville division of the defendant company, near the 97th mile post, east of Marion junction. When he was injured on 28 May, 1928, he was a laborer, and with three others was working under J. E. Sigmon, who was section foreman or boss, and whose orders he was in duty bound to obey. The place was on a curve and the track the trains came on could be seen about 150 to 200 yards each way from the place they were working. About twenty trains passed over the track each day. A rail on the north side of the curve, the outside rail on the track, had become defective or worn and had to be removed and a sound rail put in its place. The new rail, weighing about 900 pounds, was brought by the crew and put in the center of the track south of and two feet from the worn rail to be removed, and about seven inches had to be cut off to fit and allow for expansion and contraction. This took about 30 or 40 minutes. After this was done, two of the laborers were sent in opposite directions with red flags to protect the workmen from the coming of trains. To remove the worn or defective rail, the laborers with the crowbars pulled out the spikes on the inside of the rail; one of the laborers worked on the east and plaintiff on the west, taking off the bolts and angle bars that fastened the worn rail to the adjoining rails. When this was accomplished, the foreman gave orders that one of the laborers go to the east and plaintiff to the west and knock the rail in. The rail was tight, and usually when knocked loose would recoil or rebound. When plaintiff started to do this the foreman was opposite from the direction he was going. "When he told me to go and knock that rail loose, he called me and said, `Walter, hurry up and get your bolts out and your angle bars off, and let's get this rail removed.' . . . In an effort to knock it loose at the end, I struck it some three or four times. I struck it with a ten-pound hammer. We usually use that size hammer for such work. I struck it as hard as I could. At the time I was knocking at the end of this rail with my hammer, I was standing with my back toward the foreman, Mr. Sigmon. I really don't know where he was then or what he was engaged in. . . . After I dealt these blows to the end of the rail and it wouldn't move, I stepped over inside. I thought there might be a spike that probably wasn't pulled. Sometimes where the timber was not so sound, the tie plate was cut down and the rail was wedged against the wood. Sometimes you have to cut the wood. If there are spikes, of course, they have to be removed before it will move. Just after I made the step the rail hit me. Just as I stepped over the rail I didn't see what the section foreman was doing as that rail struck me. At the time the rail struck me, the best I could tell it was rebounding. The rail struck my foot three times. It seemed like it paralyzed me for a moment so that I couldn't move, and when I did *Page 400 
move, I found that my ankle was over. The rail rebounded, moved backwards and forwards, but I couldn't say how many times. To the best of my knowledge, it struck me three times. The rail couldn't possibly have rebounded before it was made loose in the position in which I was working at the time. It was not released by the blows which I dealt it at the end; it was released by some other means. . . . After I struck I saw Mr. Sigmon and Mr. Swafford standing near the center of the rail with crow-bars in their hands. They were on the outside of the rail. The rail had moved from them. . . . There was nobody else in a position that they could have moved the rail except Sigmon and this other hand with the crow-bars. . . . So we put this new rail that was going to take the place of the old one right there in a convenient place on the track where we were going to take out the old rail. This was the main line of the Southern Railroad, standard gauge track, and to the best of my knowledge, it is about 56 inches — four feet and eight inches, to be exact. This was a very sharp curve. As to your question, the greater the curve, the greater the danger from removing rails after being confined for some time, that they will kick back; that depends on how tight the track is. . . . I suppose John Swafford went to work at his end. I didn't see him. I couldn't do the work I was required to do there in a hurry and watch somebody else three feet away from me. Part of the time my back was to him and I was changing positions there. I don't know that I even glanced up while I was taking the bolts out to see what anybody else was doing. Why should I be interested in what they were doing? I was trying to do the work I was assigned to do, and I couldn't do that and watch what somebody was doing. I didn't see that it was necessary. When I saw the rail wouldn't move I looked to see what was the matter, and also to see what the foreman would say. When I looked up the rail struck me. . . . Q. If you had continued to stand where you were ordered to stand, and should have stood in order to knock this rail loose, you wouldn't have been injured? Answer: I don't know. I had orders to knock it loose. I didn't knock it loose. I knew that this rail that was to be removed was a tight rail. I knew that a tight rail might rebound. And knowing that, I was trying to remove it, and I had orders to remove it; that Swafford had orders to knock it loose at the east end, and without knowing what the other men were doing, I put my foot in there between this rail and the other rail on the track. I was doing my ordinary duties. . . . I was not there knocking any longer than it took to make three licks. When I turned around to step between the track I was facing south. And looking south, I couldn't see the other hands and see what they were doing. If I had looked up I could have seen them. I never saw them until after the rail struck me. They were *Page 401 
standing near the center of the rail with bars in their hands. . . . At the time Mr. Sigmon told me to go to the west end of the rail and knock it loose with my hammer, he did not have the crow-bars under the rail. He was standing straight up. He didn't have his crow-bars at the rail to my knowledge. I was there where I could see him. Q. What notice, if any, did you have that the rail was going to be removed by the crow-bars until it was moved. A. I didn't know that it was going to be moved at all until it struck me. (Cross-examination): I said I didn't know the rail was going to be moved. I went there for the purpose of removing the rail. I didn't knowthey were going to throw the rail over on top of me without warning me. I saw the crow-bars laying around on the ground. Sigmon didn't have any crow-bars in his hands. I knew that in removing rails that were tight on a curve they used crow-bars, but they generally say something about it when they get ready to use them. That is the only time I ever knowed he missed it. I depended on warning. I knew they always used crow-bars in removing tight rails when they wouldn't come out by knocking with the hammer."
It was in evidence that plaintiff worked off and on for defendant as a laborer for some twenty-seven years, and the last five and a half years regularly.
John Swafford, one of the section crew, a witness for defendant, on cross-examination, was asked: "Do you think it is dangerous to shove a rail in with crow-bars without warning all the people within reach of it that it would be dangerous? Answer: Well, it is dangerous all right."
The evidence on the part of the defendant was to the effect that plaintiff was ordered to go to the west and on the north side of the worn or defective rail and knock the rail loose, and if he had obeyed these instructions he would not have been injured. That he knew at the time this order was given him that the foreman and another were using the crow-bars at the middle of the rail to prize the rail loose, and with this knowledge he stepped over between the rail being removed and the new rail, and was injured by his own negligence. That he knew from his experience the rail when released would recoil or rebound; that he abandoned the place of safety on the north side of the rail where he was ordered by the foreman to stand and knock the worn or defective rail loose, and with knowledge of the peril and risk abandoned his place of safety and voluntarily stepped into a place of danger and was injured, and assumed the risk.
The issues submitted to the jury and their answers thereto, were as follows:
"1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: Yes. *Page 402 
2. Did the plaintiff assume the risk as alleged in the answer? Answer: No.
3. Did the plaintiff, by his own negligence, contribute to his injury, as alleged in the answer? Answer: Yes.
4. What damage, if any, is the plaintiff entitled to recover. Answer: $5,000."
The defendant, at the close of plaintiff's evidence, and at the close of all the evidence, made motions for judgment as in case of nonsuit. C. S., 567. The court below overruled the motions, and in this we see no error. The defendant also in apt time, in writing, requested the court below to instruct the jury to answer the first issue "No" and the second issue "Yes." C. S., 565. The court below refused to give these instructions, and in this we can see no error.
It is admitted that when the injury occurred defendant was engaged, and plaintiff was employed by defendant, in interstate commerce. The action must be determined by the Federal Employers' Liability Act. Cole v. R. R.,ante, 389.
"The decision of the United States Supreme Court upon the proper interpretation, construction, and effect of statutes regulating or affecting interstate and foreign commerce is conclusive upon all other tribunals when the same matters are called in question. And the decisions of the Federal courts are to be followed by the State courts, in the construction of the act." Richey, Federal Employers' Liability, (2 ed.), ch. 5, p. 33, sec. 20.
"Under section 1 of the act the employer is liable, other requisites being shown, for `injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.' The act does not give a cause of action to the employee for injuries not occasioned by negligence, and no recovery can be had under this act by simply showing the injury, and that at the time the injured servant was engaged in interstate commerce." Richey, supra, p. 117-8; R. R. v. Horton, 233 U.S. 492, 59 Law Ed., 1062, 162 N.C. 424.
"By section 3 of the act it is provided that `no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation of such common carrier of any statute enacted for the safety of employees contributed to the *Page 403 
injury or death of such employee.' In other words, as to cases of this character, the defense of contributory negligence is wholly abolished." Richey, supra, p. 150-1.
"By section 4 of the act of 1908, it is provided that: `In any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.' The defenses of assumed risk and contributory negligence have frequently been referred to and discussed by courts without making any discrimination between them. This is doubtless due to the fact that both have heretofore been treated in law as complete defenses in suits for personal injuries, and there was no necessity for observing the technical legal distinction. And while of little consequence when both led to the same result, it becomes important in actions founded upon the Federal act, which in ordinary cases recognized assumption of risk as a complete bar to the action, while contributory negligence merely mitigates the damages. Nor is it to be supposed that Congress in enacting the statute was ignorant of the distinction, because it is only through a distinction between contributory negligence and assumption of risk being recognized, that any, but a contradictory meaning would be expressed by sections 3 and 4." Richey, p. 167; R. R. v. Horton, supra.
"The general rule of the Federal courts as to assumption of risk is stated in the case of Gila Valley, etc., R. Co. v. Hall, 232 U.S. 94, as follows: `An employee assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employee has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employee with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person, under the circumstances, would have appreciated it.' A servant on accepting employment assumes all the ordinary and usual risks and perils incident thereto. The `ordinary' risks are those which are a part of the natural and ordinary *Page 404 
method of conducting the business and which are often recurring. The `usual' risks are those which are common, frequent, and customary. Every risk which is not caused by a negligent act or omission on the part of the employer is an ordinary risk." Richey, p. 177-8.
It appears from the record, and there seems to be no dispute, that J. E. Sigmon was the foreman or boss and alter ego of defendant company, whose orders and directions plaintiff was in duty bound to obey. Patton v. R. R.,96 N.C. 455; Thompson v. Oil Co., 177 N.C. 279; Davis v. ShipbuildingCo., 180 N.C. 74; Robinson v. Ivey, 193 N.C. 805.
From the law before stated, laid down by the Supreme Court of the United States, construing the Federal Employers' Liability Act, it will be noted that recovery is based on negligence as it exists at common law. Cole v. R.R., supra.
The plaintiff's evidence was to the effect that he was performing his duty in knocking the worn or defective rail loose with a hammer, as he was instructed by defendant's alter ego to do. When striking it a few blows it did not come loose and he stepped over inside to see if a spike probably was not pulled, or sometimes the timber (cross-ties) was not sound, the tie plate was cut down and the rail would become wedged against the wood and the wood would have to be cut. When he was ordered to do the work, Sigmon, the boss, and the other member of the crew did not have the crow-bars under the center of the worn or defective rail to prize it. He didn't know it was going to be moved by the crow-bars until he was struck. He was standing with his back to the foreman. He did not know that the rail was going to be thrown on him without warning — "I depended on warning." The testimony of defendant's witness, Sigmon, was to the contrary. The jury has taken plaintiff's version of how he was injured and we are bound by their finding. The evidence was sufficient to be submitted to the jury on the question of negligence, assumption of risk and contributory negligence.
"A servant does not assume the extraordinary and unusual risks of the employment, and he does not assume the risks which would not have existed if the employer had fulfilled his contractual duties. But only those risks are assumed which the employment involves after the employer has done everything that he is bound to do for the purpose of securing the safety of his servants, that is, he does not assume the risk of injury from the negligence of the master." Richey, p. 179.
Defendant cited the following cases in support of its motion to nonsuit, and for a directed verdict: Tuttle v. R. R., 122 U.S. 189; Aerkfetz v.Humphries, 145 U.S. 418; Boldt v. R. R., 245 U.S. 441; R. R. v. Nixon,271 U.S. 218; R. R. v. Allen, 276 U.S. 169; R. R. v. Koske,279 U.S, 11; R. R. v. Davis, 279 U.S. 37-8. *Page 405 
From an examination of the cases we do not think they are applicable to the facts in this case. The defendant in its brief, quoting the Davis case, says: "The principle enunciated in this case covers our case as with a garment," not from the finding of the jury taking plaintiff's testimony to be true. From the orders given by the foreman for one of the laborers to go to the east and plaintiff to the west and knock the rail in or loose, plaintiff in the performance of this ordinary duty with due care could presume that no other method, and especially one fraught with danger to himself, would be resorted to, the use of crow-bars by the foreman and a helper, unless notice was given him. The stepping in between the two rails to see why it did not release on knocking, a reason, being given, was not such assumption of risk that would as a matter of law bar a recovery. All of these were matters for the jury to determine.
The question asked on cross-examination of defendant's witness: "You think it is dangerous to shove a rail in with crow-bars without warning all of the people within reach of it, that it would be dangerous? Answer: `Well, it is dangerous all right.'" Plaintiff excepted to this, but made no assignment of error. The exception cannot be considered, Rule 28, Rules of Supreme Court, 192 N.C. 853, yet we think it competent. The witness was an employee of defendant. "This is sometimes spoken of as the `shorthand statement of a fact,' or as the statement of `a composite or compound fact,' several circumstances combining to make another fact." Marshall v.Telephone Co., 181 N.C. at 294. Our Court has allowed testimony to the effect that a different arrangement would have resulted in there being `a source of danger eliminated.'" Horne v. Power Co., 144 N.C. 378. That "a double chain would be safer than the single one." Britt v. R. R.,148 N.C. 41; that a car used in manufacturing iron was "defective,"Alley v. Pipe Co., 159 N.C. 327; that a voltage of 110 was not "dangerous,"Monds v. Dunn, 163 N.C. 110; that "I was walking just as careful as I could be." Renn v. R. R., 170 N.C. at 141.
In McCord v. Harrison-Wright Co., 198 N.C. at p. 745, the following was held competent: "It was supposed to be cut off and dressed up, too, because it was dangerous."
"When an inference is so usual, natural, or instinctive as to accord with general experience, its statement is received as substantially one of a fact — part of the common stock of knowledge." 22 C. J., p. 530;Street v. Coal Co., 196 N.C. at p. 183.
The court below charged: "Now, there is another risk that an employee may assume, even though the injury is brought about by the negligence of the defendant, and that is where one is injured by the negligence of an employer where the result of the negligent act, the *Page 406 
danger in which he is working, is so open and obvious that he can see it, observe it, and know the danger, the probability of danger to himself, even if it is the result of the negligence of the employer; when the employee sees the defect, sees the danger, faces the probability of danger to himself, understands it, observes it, and then if he continues to work under those conditions the law says he assumes the risk; that is, the probability of injury to himself, even though the defendant might be negligent. (If the probability of danger is greater than that of safety, or if it is so open and apparent, and there is such probability of injury that a man of ordinary prudence would not work under those conditions and he continues to work under them, the law says that he assumes the risk of the injury by continuing in the work, even though it is brought about by the negligence of the employer. That is what the law means by assumption of risk.)"
The latter part, in parentheses, is excepted to and assigned as error by defendant. Taking the charge of the court below as a whole, and defendant's prayers for instructions, among other phases, the following was given, viz.: "In the consideration of the second issue, the court instructs you that, the plaintiff in becoming a member of the defendant's section crew assumed, under the contract of employment, all the ordinary risks, hazards, and dangers of his employment and that, if he was injured in consequence of one of these ordinary risks, hazards, and dangers, that it would be your duty to answer the second issue, Yes."
We cannot hold from the authorities in the Federal Courts on the facts in this case, that this assignment of error can be sustained. "The principal element of assumed risk is knowledge. Of usual and ordinary risks this is presumed, but many of the risks previously noted as not being assumed, as negligence of the employer, and extraordinary risks, are assumed when the employee with knowledge thereof continues his employment without objection. This knowledge must be shown, and that the plaintiff appreciated or was bound to appreciate the risk. . . . But risks which are open and obvious or which in the exercise of ordinary care an employee would have discovered, he is presumed to know and assume. But by this it is not understood that the employee is under a duty to anticipate or take any precautions to discover a danger the result of negligence on the part of the employer or coemployees." Richey, supra, p. 180-1-2-3. As to the rule in this jurisdiction, see Maulden v. Chair Co., 196 N.C. at p. 124.
The court below defined negligence, proximate cause, assumption of risk and contributory negligence, and applied the law applicable to the facts. The court below stated to the jury, "I am requested to give you some special instructions which I give you as instructions from the court." The court gave eight pages of instructions prepared by defendant, *Page 407 
setting forth the defendant's contentions, covering every phase on each issue, and the charge on each issue was to the effect that the particular issue should be answered for defendant. The court gave in substance in the special instructions and in the charge substantially everything prayed for by defendant except nonsuiting plaintiff, and the prayer on all the evidence plaintiff could not recover. From the prayers asked for by defendant and given by the court below, the court "mighty near" charged plaintiff out of court. We do not think the charge subject to criticism under (Revisal, 535) C. S., 564.
The exception and assignment of error in reference to the charge as to "due care" cannot be sustained. This was premised on plaintiff's evidence. We think if the charge is taken as a whole, with defendant's prayers for instructions as given, and not disconnectedly, that in it there is no reversible or prejudicial error.
The court below seemed to have tried the case with "due care." In law we find
No error.