In speaking of the Southern Railway Company, it will be referred to as the "Southern" and the Seaboard Air Line Railway Company, as the "Seaboard."
This is an action in the final analysis for actionable negligence, brought by plaintiff against the defendants as joint tort-feasors. The plaintiff contends that there was a track at Franklin, Va., in the shape of a semi-circle, connecting the two defendants' railroads that has *Page 546 
parallel lines, known as an "exchange track." The main line of the Southern was on the east side and the Seaboard on the west. That this "exchange track" was used for the purpose of transferring cars from the Southern to the Seaboard track, or from the Seaboard to the Southern track. That on 27 October, 1913, there was a contract entered into in full force at the time of plaintiff's injury, between said defendant railroads. The contract, in part, reads: "(4) The portions of said track a joint interest in which is hereby conveyed aggregating 1,679 feet. . . . That each party hereto shall have equal rights with the other in and to the use of said portions of said track so to be jointly owned and operated hereunder, as aforesaid, but shall so use the same. as to cause the least practicable interference with, interruption of, danger or delay to, the operating of the other party hereto thereupon." The maintenance is to be paid half by each. Provision is made in the joint contract as to liability for damages: "(7) That the responsibility of the parties hereto, as between themselves, for the defense or payment of any and all claims, demands, suits, judgments or sums of money to any person accuring for loss, injury or damage, however resulting, either to person or estate, and arising by reason of, or in connection with the joint use by the parties hereto of the said tracks, as aforesaid, shall be distributed as follows, that is to say"; etc. "(b) When the proximate cause of any such damage shall be negligence to which employees of both parties hereto shall have contributed, then each party hereto shall bear all loss incident to any injury to, or damage of its own property; but the responsibility for all loss or damage accruing to employees or third persons or corporations, not parties hereto, by reason of such concurrent negligence, shall be borne by the parties hereto in equal contribution."
On 10 December, 1927, and for about six months prior thereto, the plaintiff was in the employ of the Seaboard on this "exchange track" as car inspector and repairman, and also working for the Southern as repairman. The Seaboard paid him, but inferentially the Southern contributed to his pay. Freight that was to be transferred to the Southern would go over the connecting tracks, also freight to be transferred to the Seaboard. Between the two was a State highway grade crossing. Between the Seaboard tracks and the highway was the car inspector's shanty used by plaintiff.
Plaintiff testified, in part: "They used this connection track for other purposes, they put cars in there for the Seaboard to pick up, and they would put cars in there for the Southern to pick up the next day, and for moving cars from the Southern to the Seaboard and back. It was used for repairing brakes. I went to work at Franklin, Va., in July, 1927, and was constantly employed there from that time until I was *Page 547 
injured. . . . We repaired cars there every day on this track; when a train came in and there was something wrong with the car I would get the car and repair it. I had nothing to do with the placing of cars on the track. I made repairs to those bad order cars coming in. I made repairs on that track all the time I was there. Southern trains usually came in on that connection track anywhere between 10:45 and 11:00 o'clock to pick up cars; the passenger train was due at 10:58. On 10 December, 1927, the train came in from the Southern on the connection track between 9:15 and 9:30 in the morning. I had never seen it there as early as that before. It was a switcher out of Portsmouth. . . . Q. During your entire employment there what was the custom and practice with respect to making light repairs to freight cars? (Objection by defendants; overruled. Defendants except.) A. The custom and practice was to repair them at different places wherever it was convenient; around the yard limits where it was convenient, and I repaired some over the river and some on this connection track and in different places. . . . My tools were in the shanty. I had nothing to do with the movement of cars. On the morning of 10 December, 1927, I was applying a brake shoe on a Southern car on the connection track, located just a few steps from the shanty toward the highway, and I think it was east. It was toward the Southern track. That car was placed there about five minutes before I went to repair it. Before I made repairs to it, itwas not in safe condition for movement. It had a defective brake. . . . I was working on the end of the car in the opposite direction from which the Southern train came. It would be hard to see a train coming from the Southern to the Seaboard because there is a big bank on the inside of the curve. . . . Q. State whether or not you had repaired cars on this connection track for the period of time you had worked prior to 10 December, 1927? A. Yes. Q. What was the custom of the crew of the Southern when they would come in the connection track to get cars from the Seaboard for the Southern? A. It was customary for the trains to come into the connection track and stop before coupling to the cars and for a member of the Southern crew to get down on the ground and look around the car and see if it was ready for the Southern to move it. Q. State whether or not that had been the custom during the entire time you had worked there for the Southern and the Seaboard? (Objection by defendants; overruled. Defendant except.) A. Yes. . . . I was working on the end of the car nearest the shanty, replacing a brake shoe. I was connecting a brake under the car. I was facing the car, I had to put a brake shoe in and that is next to the wheel on the inside, and the old shoe was worn out, and to apply the new one I had to disconnect the brake under the car, and I got a new shoe in and stepped back underneath to reconnect *Page 548 
the brakes. There is a piece of casting that extends toward the end, and there is a lever piece to the casting, and there are several places where you tighten them. I earned around $145.00 per month at this place. I did not have any notice or warning of any kind that any car or train was coming over that connection track during that hour? I did not ever, at any time, see that train or car come in over that track from the Southern end at that hour of the day. . . . I was performing my services like I had been and making the light running repairs. This was the kind of repair that I was required to make. Replacing parts is a light repair. Performing the service I was performing required me to be in the position that I was in at the time referred to. While I was engaged in the performance of my duties the Southern from the other end came in over this track and hit the car that I was working on and knocked me up under it and dragged me, squeezed me and mashed me at the same time. Q. State whether or not any signal was given of the approach of that train? A. No; I never heard a sound of it. I never heard a sound of any signal. I had no knowledge of the approach of the train until the collision occurred. Wedges under the wheel were holding the car stationary upon which I was working, sufficient to keep it from moving of its own volition. It was a hard blow, and it was knocked the length of the car, and I couldn't get out, and give an alarm that I was hurt. It dragged me the distance of the car." The length of the car was between 30 and 40 feet. Plaintiff testified further that blue flags were "not used for making repairs on a transportation yard. . . . I was just broke to pieces and my chest, back and head seemed like it was crushed. The left jaw was broke, and my eyes swollen so that I could not see. I never have closed my teeth on one side since, and they do not come together. . . . I am not able now to close my teeth and chew food as I did before. They did not do anything to the jaw at the hospital. My back and shoulder pain me all the time; when I try to erect myself it hurts. I am deformed and I am very much stooped over. The left shoulder is one or two inches lower than the right one since I was injured. The left shoulder was broken. The bottom of that shoulder is where I am troubled, and it never has been right." Plaintiff made no request for this car to be removed. "I could not lean out to the side and see. I would not see around the bend on account of the curve and the high bank. That is the way I had done it since I had been there. If I needed assistance I could call on the section people. I suppose if I had needed any one that morning to help me I would have called on the section force and I suppose they would have come. I had repaired cars on other tracks. The derailer had been set on the track toward the point from which the Seaboard came in. No train could come in over that unless the derailer *Page 549 
and switch were changed. . . . I was making repairs at Franklin in the same manner in which I theretofore made repairs at Raleigh. In this case I did not know that the car was going to be moved by the Southern or any other train. The connection track was the most convenient place in the yard to make these repairs. No assistant was necessary in making that repair. Q. What about the force with which the coupling was made, had you observed that prior to this date? (Objection by defendants; overruled. Defendants except.) A. Yes. Q. How did the manner in which that coupling was made that morning compare with the force ordinarily used? (Objection by defendants; overruled. Defendants except.) A. It seemed to hit the car much harder, shoving it up at least a car length. I had not noticed them hitting that hard before. Q. State whether or not there was any necessity of using the force that was used to make it? (Objection by defendants; overruled. Defendants except.) A. No. Q. State whether or not there was any necessity of knocking the car any distance? (Objection by defendants; overruled. Defendants except.) A. As a general rule it moved a few inches, and you can couple a car just moving it a few inches. I was never furnished any rule book by either the Southern or Seaboard. I answered what the name of the book was that Major Joyner showed me, by reading the name printed on the front of it. . . . I did not ever request the Seaboard or Southern to furnish me a blue flag. There had not been any custom or practice that required the use of a blue flag on my part."
Upon demand made upon the defendants by counsel for plaintiff the defendant, Southern, furnished to plaintiff the papers which were admitted by the defendant, Southern, to be a true copy of the contract between the Southern and the Seaboard relative to the interchange track and in force and effect on 10 December, 1927. The plaintiff offered this contract in evidence.
Plaintiff offered in evidence a portion, of section 5 of the answer of defendant, Seaboard, as follows: "It is admitted that the interchange or connection track at Franklin, Va., is used in the transfer of freight cars between this defendant and the Southern under a private contract entered into by this defendant and said company." (The Southern and Seaboard both objected to the introduction of the contract, overruled, the defendants except.)
Plaintiff offered in evidence a portion of the answer of defendant, Seaboard, to section of the amended complaint, as follows: "It is admitted that on 10 December, 1927, the plaintiff was engaged in making repairs to Southern box car No. 35869 on the track connecting this defendant's line of railroad with that of the Southern."
The defendant, Seaboard, admitted that it was engaged and that plaintiff was employed in interstate commerce at the time of the injury. *Page 550 
R.H. Peters, a witness for defendant, Southern, testified in part: "I am an employee of the Southern. I am operator-clerk at Franklin, Va., and have been there since 1918, and I have been with the railroad for twelve years. On and before 10 December, 1927, it was my duty relative to noting the arrival of Southern trains to put it down on regular forms. I made a record of the arrival of trains of which Mr. Yarborough was the conductor known as the switcher. I have here the record which I made myself that records the arrival of trains at Franklin. The switcher arrived at Franklin at 9:35 on 10 December, 1927. The general arrival of the time of that train varied. It depended upon the volume of business. . . . During the latter part of November the hours of arrival were later, depending upon the amount of business. In connection with the removal of Southern cars from the interchange track it was my duty to receive the numbers from the Seaboard and they notified me that they were on there and I had to give the conductor a list to take them off. I do not know whether it was the custom of the Seaboard to notify me when a car was placed on the track. They would phone us that the cars were ready to be pulled. My records show that on 10 December, 1927, Conductor McGee (of the Seaboard) phoned that Southern empty car number 36859 was ready for movement, and that is all the information that I had at the time concerning the car. That was the regular way of notifying me, either by that or the agent. After I got that information I put it down on the record book and put it on the switch list to come out. I gave the directions to Conductor Yarborough as soon as he got in the office."
J. T. Soloman, a witness for Southern, testified "Am employee of Seaboard. I am clerk for supply department." On cross-examination: "The records do not show that any blue flag was sent to Mr. Hamilton."
The issues submitted to the jury and their answers thereto, were as follows:
"1. Was the plaintiff injured by the negligence of the defendant, Southern, as alleged in the complaint? Answer: Yes.
2. If so, did the plaintiff by his own negligence contribute to his injury as alleged in defendant Southern's answer? Answer: No.
3. Was the plaintiff engaged in interstate commerce at the time of his injury? Answer: Yes.
4. Was the plaintiff injured by the negligence of the defendant Seaboard, as alleged in the complaint? Answer: Yes.
5. If so, did the plaintiff by his own negligence contribute to his own injury as alleged in the answer of defendant Seaboard? Answer: No.
6. Did the plaintiff voluntarily assume the risks of his injury as alleged in the answer of the defendant Seaboard? Answer: No. *Page 551 
7. What amount of damages, if any, has plaintiff sustained by reason of his injury? Answer: $33,875.00.
8. If the plaintiff by his own negligence contributed to his injury, by what amount are the damages to be reduced? Answer: ........"
Upon the verdict, the court below rendered judgment. The defendants made numerous exceptions and assignments of error and appealed to the Supreme Court.
The other material facts will be considered in the opinion.
At the conclusion of plaintiff's evidence, the defendant, Southern, moved for judgment as in case of nonsuit. C. S., 567. The court overruled this motion and the defendant, Southern, duly excepted and assigned error.
At the conclusion of plaintiff's evidence, the defendant, Seaboard, moved for judgment as in case of nonsuit. C. S., 567. The court overruled this motion and the defendant, Seaboard, duly excepted and assigned error.
The defendant, Seaboard, then rested without offering testimony and renewed its motion for judgment of nonsuit at the close of all the evidence. The court overruled this motion, and the defendant, Seaboard, duly excepted and assigned error. C. S., 567.
In Moore v. R. R., 179 N.C. at p. 639, we find: "It is the rule prevailing in both State and Federal procedure that on a motion for involuntary nonsuit, equivalent with us to a demurrer to the evidence the facts presented which make in favor of plaintiff's claim, must be accepted as true and interpreted in the light most favorable to him." Certiorari
denied. Director General of Railroads v. Moore, 254 U.S. 640; SouthernRailway Co. v. Gray, 241 U.S. at p. 337 (167 N.C. 433).
The defendant, Seaboard, then requested the court in writing to instruct the jury that they cannot consider as evidence against defendant, Seaboard, any testimony offered by the defendant Southern, or by plaintiff in rebuttal. The court refused to so instruct the jury and the defendant, Seaboard, excepted and assigned error. C. S., 565.
The defendant, Southern, offered the conductor of its train at the time of the injury, who started to testify. Defendant, Seaboard, at this point moved the court to instruct the jury that none of this evidence was to be considered against the Seaboard. The motion was overruled and the defendant, Seaboard, excepted and assigned error. We think the court was correct in overruling all the above motions and the instructions prayed for by the Seaboard. *Page 552 
The defendant, Seaboard, admitted that it was engaged in and plaintiff was employed in interstate commerce at the time of his injury. It also admitted that on 10 December, 1927, the day plaintiff was injured, he was engaged in making repairs to Southern box car No. 35869, on the track connecting its line of railroad with that of the Southern.
The Supreme Court of the United States declared the First Federal Employers' Liability Act invalid. First Employers' Liability Cases,207 U.S. 463, 52 L.Ed., 297.
The Second Federal Employers' Act was held valid. 223 U.S. 1,56 L.Ed., 327. "The first section provides that every common carrier by railroad while engaged in interstate commerce shall be liable to every employee while employed by such carrier in such commerce or in case of his death, to certain beneficiaries therein named, for such injuryor death, resulting in whole or in part, from the negligence of thecarrier, or its employees, or by defects or insufficiencies due tonegligence in any of its equipments or property. The second section provides that every common carrier by railroad on lands of the United States other than states shall be liable in the same way to any of its employees. The third section prescribes thatcontributory negligence shall not bar recovery, but shall only diminishthe damages, except that no employee injured or killed where theviolation of a safety law for employees contributed to the injury,shall be held to have been guilty of contributory negligence. 
The fourth section provides that assumption of risk shall not be a defense, where the violation of a safety law contributed to the accident. The fifth section declares all contracts or devices intended to exempt the carrier from liability under the act to be void, except that the carrier may plead as a set-off any sum it paid to the injured employee as insurance or relief fund. Section 6 provides that any action under the act is barred after two years. Section 7 declares that the term `common carrier,' as used in the statute, shall include the receiver or receivers or other persons or corporations charged with the duty of the management and operation of the business of a common carrier." (Italics ours.) 2 Roberts Federal Liabilities and Carriers (2d ed.) (1929), part sec. 709, p. 1329.
The defects in the act of 1908 were covered by amendments of 1910. "In the enforcement of the provisions of the act of 1908, the courts held that the right of action given to an injured employee did not survive to his personal representative in the event of his death; that an action instituted in the state court under the Federal Act could be removed to the proper circuit court when the required amount was involved and a diversity of citizenship existed, and that when the jurisdiction of a Federal Circuit Court was based on the fact that the suit arose under a law of the United States, the plaintiff was compelled to sue in the *Page 553 
district of which the defendant was an inhabitant, which, in case of a corporation, was the jurisdiction in which the charter of the defendant corporation was issued. . . . The amendatory act of 1910 resulted from the decisions of the courts in these cases. The amendment to section 6 providedthat any action under the act may be brought in a circuit court of theUnited States, in the district of the residence of the defendant, or inwhich the cause of action arose, or in which the defendant shall be doingbusiness at the time of commencing such action, and further prescribed thatthe jurisdiction of the courts of the United States under the act shall beconcurrent with that of the courts of the several states, and no case arising under the act and brought in any state court of competent jurisdiction shall be removed to any court of the United States. The second amendment provided that any right of action given by the act to a person suffering injury shall survive to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee, and, if none, then of such employee's parents, and, if none, then of the next of kin dependent upon such employee, but in such cases there shall be only one recovery for the same injury." (Italics ours.) Roberts,supra, sec. 710, pp. 1336-7. Lamb v. R. R., 179 N.C. 622; Barbee v.Davis, 187 N.C. 78, certiorari denied, 264 U.S. 588; Southwell v. R.R., 191 N.C. 153, 275 U.S. 64; Inge v. R. R., 192 N.C. 522,certiorari denied, 273 U.S. 753; Troxler v. R. R., 194 N.C. 446; Colev. R. R., 199 N.C. 389; certiorari denied, 9 January, 1931; Pyatt v. R.R., 199 N.C. 397.
"The provision of section 2 of the Safety Appliance Act of 1910, requiring all cars of railroads whose lines are highways of interstate commerce to be equipped with `efficient hand brakes,' unlike the provision respecting power brakes, applies to cars while engaged in switching operations and in train movements as well. The brake must at all times be `efficient.'" Roberts, supra, part sec. 719, p. 1351.
"The Safety Appliance Act, as finally amended and as supplemented by the orders of the Interstate Commerce Commission, requires the furnishing and maintenance of a considerable number of appliances. . . . Here, also, maybe placed the provision permitting a carrier to refuse to receive fromconnecting carriers or shippers any cars not equipped sufficiently, inaccordance with the first section of the act, with such power or trainbrakes as will work and readily interchange with the brakes in use on itsown cars, as required by the act." (Italics ours.) Roberts, supra, sec. 716, at p. 1347.
The material part of the Safety Appliance Act applicable to this case provides: "It shall be unlawful for any common carrier subject to the provisions of this act to haul, or permit to be hauled, or used, on its line any car subject to the provisions of this act not equipped with . . . *Page 554 
efficient hand brakes. . . ." (Act 14 April, 1910, 36 Stat. at L., 298, chap. 160 and part of sec. 2, 1 July, 1911.)
"The courts are agreed that the Federal Employers' Liability Act, being a humane and remedial statute, should invariably be given a liberal construction, to the end that the remedy proposed shall be advanced, and that the evil against which it was directed shall be corrected." Roberts,supra, sec. 711, p. 1337. Section 712: "Moreover, since it is a Federal statute, decisions of the National courts construing the act take precedence over those of the State courts. For example, in determining when a carrier is guilty of negligence under the act; when an employee assumes the risk; what proof creates a dependency in death cases within the meaning of the act; whether the doctrine of res ipsa loquitur applies; whether there is any evidence tending to show liability sufficient for the case to be submitted to the jury; the measure of damages and instructions thereon, are all matters upon which decisions of the National courts control. `As the action is under the Federal Employers' Liability Act, rights and obligations depend upon it and applicable principles of common law as interpreted and applied in Federal courts.' (Southern Railway Co. v. Gray,241 U.S. 333, 60 Law Ed., 1030 (167 N.C. 433, reversed). Where the decisions of the Federal courts on a question under the act are conflicting, then a State court will follow those decisions of the National courts which appear to it to rest on the better reason." Section 712, pp. 1338-40, Roberts, supra.
In Jamison v. Encarnacion, 281 U.S. at p. 640, Mr. Justice Butler, delivering the opinion of the Court, citing numerous authorities, said: "It is intended to stimulate carriers to greater diligence for the safety of their employees and of the persons and property of their patrons. . . . The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure. . . . The act is not to be narrowed by refined reasoning or for the sake of giving `negligence' a technically restricted meaning. It is to be construed liberally to fulfill the purposes for which it was enacted, and to that end the word may be read to include all the meanings given to it by courts and within the word as ordinarily used. . . . `Negligence' is a word of broad significance, and may not readily be defined with accuracy. Courts usually refrain from attempts comprehensively to state its meaning. While liability arises when one suffers injury as the result of any breach of duty owed him by another chargeable with knowledge of the probable result of his conduct, actionable negligence is often deemed — and we need not pause to consider whether rightly — to include other elements. *Page 555 
Some courts call wilful misconduct evincing intention or willingness to cause injury to another gross negligence."
In proceedings brought under the Federal Employers' Liability Act, rights and obligations depend upon it and applicable principles of common law, as interpreted and applied in Federal courts; and negligence is essential to recovery. New Orleans N.E. R. R. Co. v. Harris,247 U.S. 367.
"One of the leading cases under the Federal Employers' Liability Act was that of Seaboard A.L.R. Co. v. Horton, 233 U.S. at p. 501, reversing this Court (162 N.C. 424). Mr. Justice Pitney said: `It was the intention of Congress to base the action upon negligence only, and to exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence. The common-law rule is that an employer is not a guarantor of the safety of the place of work or of the machinery and appliances of the work; the extent of its duty to itsemployees is to see that ordinary care and prudence are exercised, to theend that the place in which the work is to be performed and the tools andappliances of the work may be safe for the workmen. Hough v. Texas P. R.Co., 100 U.S. 214; Washington G. R. Co. v. McDade, 135 U.S. 554;Choctaw, O. G. R. Co., v. McDade, 191 U.S. 64, 67.'" (Italics ours.)Southwell v. R. R., 191 N.C. at p. 157-8 (275 U.S. 64).
"The term `negligence' has been defined by the National Supreme Court to be the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done. The essence of the fault may lie in omission or commission. The duty is dictated and measured by the exigencies of the situation. Negligence has always relation to the circumstances in which one is placed, and what an ordinarily prudent man would do or omit in such circumstances. Charnock v. Texas R. R. Co.,194 U.S. 432, 48 L.Ed., 1057." Roberts, supra, sec. 811, pp. 1558-9.
In Baltimore O. R. R. Co. v. Groeger, 266 U.S. at p. 524, we find: "The credibility of witnesses, the weight and probative value of evidence are to be determined by the jury and not by the judge. However, many decisions of this Court establish that, in every case, it is the duty of the judge to direct a verdict in favor of one of the parties when the testimony and all the inferences which the jury could justifiably draw therefrom would be insufficient to support a different finding."
"It is the well settled rule of practice and accepted position in this jurisdiction, that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim and which tends to support her cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, *Page 556 
will be taken and considered in its most favorable light for the plaintiff, and she is `entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.'" Nash v.Royster, 189 N.C. at p. 410; Murphy v. Coach Co., ante, at p. 100.
"Direct or positive proof is not required to show that a negligent act or defect was the cause of an injury to, or death of, an employee engaged in interstate commerce. The manner and circumstances of the occurrence, and all the accompanying surroundings, as proven, may be examined in order to ascertain and determine whether or not an inference that a negligent defect caused the death was a reasonable one." Roberts, supra, sec. 819, at p. 1572; Goss v. Williams, 196 N.C. 216.
We have set forth at length the law in the Federal courts applicable to this action.
The defendant Seaboard, in its answer, denied negligence, and set up the plea of contributory negligence and assumption of risk. Applying the law as above stated, was the evidence in regard to negligence sufficient to be submitted to a jury? We think so. Plaintiff's evidence was to the effect: That he was working on an "exchange track" as a car repairman for the Seaboard and Southern, on 10 December, 1927, at Franklin, Va., and inferentially both defendants contributed to his pay. The evidence was sufficient to be submitted to a jury that he was in the employ of both defendants. That at the time there was an agreement between the defendant railroads in regard to the "exchange track." The answer of defendant Seaboard admitted that the "exchange track" is used in the transfer of freight cars between it and the Southern under a private contract entered into between them. The Southern on demand of plaintiff produced the contract between them relative to the "exchange track" and that it was in force and effect at the time plaintiff was injured on 10 December, 1927. The defendants are sued as joint tort-feasors. There was evidence aliunde
as to said railroads being joint tort-feasors. At least the manner of introduction of the evidence to show this was in the discretion of the court below and there was evidence of cooperation.
In Wigmore on Evidence, Vol. 2 (2 ed.), at latter part of section 1079, at p. 593, we find: "The admissions of joint tort-feasors are receivable against another on the same principle and with the same limitation as those of conspirators; this is merely the same doctrine in its application to civil liability for torts."
This contract was to the effect that each of the said railroads have "equal rights with the other in and to the use of" the "exchange track," "so to be jointly owned and operated hereunder." The maintenance to be paid half by each. Then the responsibility between them for *Page 557 
"injury" to "person," however resulting and "arising by reason of or in connection with the joint use by the parties hereto of the said tracks as aforesaid, shall be distributed as follows," etc. The responsibility for damages to employees by reason of concurrent negligence "shall be borne" by the parties hereto in equal contribution! We think the evidence sufficient to make the contract competent against both defendants.
Near this "exchange track" was a car inspector's shanty, with tools which were used by plaintiff in repair work continuously for some six months prior to the injury complained of. Cars were put on the said track by both defendants to pick up in the course of business, and it was used for repairing brakes. Plaintiff repaired cars every day on this track. That is when there was anything wrong with the cars, and made repairs on the bad order cars coming in. Plaintiff had nothing to do with the movement of the cars.
The question and answer in regard to the custom and practice in regard to making light repairs to freight cars on the "exchange track" is competent. A peculiar and special custom is not binding on a person, unless known to him. First Nat. Bank v. Birkhart, 100 U.S. 686. Long established customs and usages are to be judicially recognized as part of the law. Dalev. Pattison, 234 U.S. 399.
The rule is thus stated in Penland v. Ingle, 138 N.C. at p. 457: "The character and description of evidence admissible for establishing the custom is the fact of a general usage and practice prevailing in the particular trade or business, and not the opinions of witnesses as to the fairness or reasonableness of it." Crown Co. v. Jones, 196 N.C. at p. 211.
On the morning of plaintiff's injury, 10 December, 1927, the Seaboard placed a Southern car on the "exchange track" about five minutes before plaintiff went to repair it. When the crippled car was put in the "exchange track" by the Seaboard, the switch on the Seaboard end of the connection track was set for the main line, and there was a derailer on this track and no car could come in, and if it did the derailer would throw it off the track. The Southern car, when put on the connecting track was not in a safe condition for movement. The brake was defective. This car was a few steps from the shanty furnished for plaintiff as repairman. This car was on an incline, wedges under the wheel were placed by plaintiff for holding the car stationary to keep it from moving of its own volition, while he was working under it. Plaintiff was working on the end of the car nearest the shanty, replacing a brake shoe; he was facing the car; he had put a brake shoe in next to the wheel on the inside; the old shoe was worn out. To apply the new one he disconnected the brake under the car, when he got the new shoe in; he stepped back underneath to reconnect the brakes. There *Page 558 
was a piece of casting that extended towards the end and there was a lever piece to the casting, and there were several places to tighten them. Plaintiff, while working at the end of the car in the opposite direction from which the Southern Railway train came in, could hardly see a train coming from the Southern main track over this connection track to the Seaboard, as there was a big bank on the inside of the curve. Plaintiff gives his version of the injury as follows: "I did not have any notice or warning of any kind that any car or train was coming over that connection track during that hour. I did not ever, at any time, see that train or car come in over that track from the Southern end at that hour of the day. . . . I was performing my services like I had been and making the light running repairs. This was the kind of repair that I was required to make. Replacing parts is a light repair. Performing the service I was performing required me to be in the position that I was in at the time referred to. While I was engaged in the performance of my duties the Southern from the other end came in over this track and hit the car that I was working on and knocked me under it and dragged me, squeezed me and mashed me at the same time. Q. State whether or not any signal was given of the approach of that train? A. No, I never heard a sound of it. I never heard a sound of any signal. I had no knowledge of the approach of the train until the collision occurred."
Plaintiff, while under the car performing his duty as a repairman for both defendants, as we think the evidence warrants, the car belonged to the Southern, and in removing a worn out brake shoe the defendant Southern without warning or notice, and earlier than was customary, with unnecessary and harder force than ordinarily used, knocked the crippled car at least a car length and seriously injured plaintiff.
"Again, it is recognized in both jurisdictions that railroad companies in the operation of their freight trains are held to a high standard of care reasonably commensurate with the risks and dangers usually attendant upon the work, and although negligence may not be inferred from the ordinary jolts and jars incident to their operation, it may be imputed where there has been a `sudden, unusual, and unnecessary stopping of such trains, likely to and which do result in serious and substantial injuries to employees or passengers thereon.' Texas Pacific Ry. v. Behymer,189 U.S. 469; Texas Ry. v. Archibald, 170 U.S. 665-673; Indianapolis, etc.,Ry. v. Horst, 93 U.S. 291; Jones v. R. R., 176 N.C. 260; Ridge v. R.R., 167 N.C. 510; Suttle v. R. R., 150 N.C. 668; Marable v. R. R.,142 N.C. 557; Con. N. O. T. P. Ry. v. Evans, Admr., 129 Ky. 152." Lamb v.R. R., 179 N.C. at p. 622.
We think the exception and assignment of error in regard to this line of evidence — sudden, unusual and unnecessary coupling — under *Page 559 
the circumstances of this case, cannot be sustained. It was further in evidence on the part of plaintiff that he made no request for this car to be removed, and there was no custom or practice that required the use of ablue flag on the part of plaintiff. If the defendants, Seaboard or Southern, knew, or by the exercise of due care ought to have known that this was a crippled car, either one of the defendants under the safety appliance act could refuse to receive it until repair was made. The Seaboard knew, or in the exercise of reasonable care ought to have known, this Southern car was crippled, and when crippled or needing repair, it was the plaintiff's duty to repair it. The Southern could not haul or permit it to be hauled in its crippled condition. The evidence being to the effect that the Seaboard jointly owned, operated and used the "exchange track" with the Southern, and it was a question of due care, in that the Seaboard did not notify the Southern that it had put one of its crippled cars on the "exchange track" that required repair. At its end it had protected the car by a derailer, knowing plaintiff, in the performance of his duty, had to go under the car to repair the worn out brake, but omitted to notify the Southern of the condition of the car and the duty of plaintiff to repair same and the hazard attendant on plaintiff of the Southern going on this "exchange track" to pick up the car without giving plaintiff warning.
The courts invariably give a liberal construction to the Federal Employers' Liability Act, it being humane and remedial. It is said by Mr.Justice Butler, in the Jamison case, supra: "While liability arises when one suffers injury as the result of any breach of duty owed him by another chargeable with knowledge of the probable result of his conduct, actionable negligence is often deemed — and we need not pause to consider whether rightly — to include other elements."
The evidence in matters of this kind can be either direct or circumstantial. The authorities are to the effect that the essence of the fault may lie in omission or commission. The rule applicable may be thus stated by a general confession prayer of one of our churches: "We have left undone those things which we ought to have done; and we have done those things which we ought not to have done; and there is no health in us."
This omission on the part of the defendant, Seaboard, from the evidence, left no physical health in plaintiff, according to his testimony. As to the spiritual — that is another realm. See Grand Trunk W. R. Co. v.Lindsay, 233 U.S. 42; Chicago R. I. P. R. v. Wright, 239 U.S. 548;Texas P. R. Co. v. Rigsby, 241 U.S. 33; San Antonio A. P. R. Co. v.Wagner, 241 U.S. 476; Spokane C. R. R. v. Campbell, 241 U.S. 497.
In Link v. Seaboard Air Line R. Co., Vol. 156 S.E., at p. 483 (S.C.), an able opinion written by Associate Justice Stabler of the Supreme *Page 560 
Court, citing numerous Federal decisions: "It is now settled beyond controversy that the Federal Safety Appliance Act imposes upon the carrier an absolute duty to equip its cars with appliances prescribed in the act, and to maintain such appliances in a secure condition; and the liability for failure to do so is absolute, regardless of negligence on the part of the defendant or contributory negligence on the part of the plaintiff."
The primary cause may be the proximate cause of a disaster though it may operate through successive instruments. Milwaukee St. P. R. Co. v.Kellogg, 94 U.S. 469.
Mr. Chief Justice Waite in delivering the opinion of the Supreme Court of the United States in Grand Trunk Railway Company v. Cummings,106 U.S. 700, 27 Law Ed. at p. 267, said: "If the negligence of the companycontributed to, it must necessarily have been an immediate cause of the accident."
The rule is that man is bound to contemplate the natural and probable consequences of his own act. Lazarus v. Phelps, 152 U.S. 81.
One is held responsible for all the consequences of his acts which are natural and probable and ought to have been foreseen by a reasonably prudent man. Atchison T. S. F. R. Co. v. Calhoun, 213 U.S. 1.
To relieve the one responsible for the original wrong from liability for injury there must be the intervening of a new and independent cause between the wrong and the injury. Texas P. R. Co. v. Stewart, 228 U.S. 357.
In Roberts, supra, sec. 872, at p. 1701, we find: "The Employers' Liability Act, however, differs from the other Federal acts regulating railroads in that it states, with some particularity, the basis of civil liability of carriers for injuries to their employees. The terms of the act must be examined to ascertain whether it changes in any way the common-law rules as to proximate cause. The act declares, in section 1, that liability shall exist if the injury or death, as the case may be, was one `resultingin whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency, dueto its negligence, in its cars . . . or other equipment.' In identical language the same conditions of liability are restated in section 2 of the Liability Act. By section 3 contributory negligence is eliminated as a factor in determining liability, and by section 4 assumption of risk is likewise eliminated in those cases wherein a violation by the defendant carrier of any of the Federal safety statutes `contributed to the injury of such employee.' Disregarding the purely negative influence upon the question of liability of the defense of assumption of risk, and considering only the positive factors, negligence of the employer and want of care on the part of the employee, *Page 561 
it seems clear, in the light of the provisions above abstracted, that the liability statute definitely recognizes the complex causal basis of the most injuries, and, in effect, states that if, among the several factors which have combined to produce an injury within the purview of the statute, there shall be found any negligent act or omission on the part of the carrier to which such injury was even in part due, then liability for such injury shall fall upon the carrier. . . . (p. 1703). In the words of Mr.Justice Holmes: `We must look at the situation as a practical unit, rather than inquire into a purely logical priority.'"
With the facts above set forth and the law as stated, and taking all the evidence, circumstantial and direct, the Safety Appliance Act, and the entire facts and circumstances of this case, we think the evidence was sufficient to be submitted to the jury on negligence and proximate cause as to both defendants. The burden is on plaintiff as to negligence and on the defendants as to contributory negligence and assumption of risk. Speas v.Bank, 188 N.C. 524.
"Contributory negligence under the Federal Employers' Liability Act has been defined by the United States Supreme Court in the following language: `Contributory negligence involves the notion of some fault or breach of duty on the part of the employee, and since it is ordinarily his duty to take some precaution for his own safety when engaged in a hazardous occupation, contributory negligence is sometimes defined as a failure to use such care for his safety as ordinarily prudent employees in similar circumstances would use.' Seaboard Air Line Ry. Co. v. Horton,233 U.S. 492, 58 L.Ed., 1062. In another case before the Supreme Court of the United States the following definition of contributory negligence was approved: `Contributory negligence is the negligent act of a plaintiff which, concurring and cooperating with the negligent act of a defendant, is the proximate cause of the injury.' Norfolk W. R. Co. v. Earnest,229 U.S. 114, 57 L.Ed., 1096. Roberts, supra, p. 218, sec. 112."Inge v. R. R., 192 N.C. at p. 531; 273 U.S. 753.
"A servant does not assume the extraordinary and unusual risks of the employment, and he does not assume the risks which would not have existed if the employer had fulfilled his contractual duties. But only those risks are assumed which the employment involves after the employer has done everything that he is bound to do for the purpose of securing the safety of his servants, that is, he does not assume the risk of injury from the negligence of the master." Richey, Federal Employers' Liability Act (2 ed.), p. 179; Pyatt v. R. R., 199 N.C. at p. 404.
So far as extraordinary hazards are concerned, an interstate railway employee may assume that the employer and his agents have exercised proper care with respect to his safety until notified to the contrary, *Page 562 
unless the want of care and dangers arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them. Chicago, R. I. P. R. Co. v. Ward, 252 U.S. 18.
Was defendant, Seaboard, entitled to an instruction that evidence offered by its codefendant, Southern, and by plaintiff, in rebuttal could not be considered against defendant Seaboard? We think not. The evidence on the part of plaintiff was to the effect that defendants were jointtort-feasors. Was Seaboard counsel entitled to the concluding speech to the jury, having introduced no evidence? We think not.
"This question of practice has not been heretofore presented. It is the recollection of the members of this Court that the practice has been, that where one defendant introduces evidence, that gives the right to begin and conclude the argument to the State, and we adopt that view as the better rule. If there were several defendants, the rule claimed by the defendant would be inconvenient." S. v. Robinson, 124 N.C. at p. 802.
The defendant, Seaboard, relied on Rule 3 of Rules of Practice in North Carolina Superior Courts, as follows: "In all cases, civil or criminal, when no evidence is introduced by the defendant, the right of reply and conclusion shall belong to his counsel." This rule is not controlling as interpreted by defendant, Seaboard. This action is against jointtort-feasors.
Taking the charge as a whole, we think the court below correctly instructed the jury on the different issues relative to the Seaboard, as to the burden of proof, accurately defined negligence, contributory negligence, proximate cause, assumption of risk, and damages, and applied the law applicable to the facts. We do not think there was error in the admission and exclusion of evidence. We do not find any prejudicial or reversible error which would entitle the Seaboard Air Line Railway Company to a new trial.
As to the defense of the Southern: From the evidence we do not think the Southern can sustain its motions for judgment as in case of nonsuit at the close of plaintiff's evidence and at the close of all the evidence, and the court below properly overruled the motions. Nor do we think there was error in the admission and exclusion of evidence, or in the charge of the court below.
In the decision of this case, we are treating this as an action for actionable negligence against joint tort-feasors. The evidence set forth what was said, and the authorities cited, in reference to the Seaboard's contentions are also mainly applicable to the Southern. The Southern in its answer denied negligence and denied that plaintiff was an employee. It set up the plea of assumption of risk and contributory negligence, and further "plaintiff failed to display a blue flag, as is the *Page 563 
custom and as he was by the rules of his employer required to do, giving notice that he was engaged in making repairs on or about the said car."
The evidence as to the blue flag rule and custom in this section at Franklin on the "exchange track" was disputed by plaintiff. From a careful review of the evidence on both sides, and the charge of the court below, this was a question of fact and was left for the jury to determine. The exceptions and assignments of error as to the exclusion of certain general rules and customs not confined to the locality of Franklin were overruled, and in this we can see no error. The question involved was not the rule and custom of a general usage and practice prevailing elsewhere, this would not tend to give plaintiff notice. The decision as to what constitutes usage and practice is heretofore cited. Then again, plaintiff contended if there was ever such a rule of the railroad it was a dead rule as to this "exchange track" and in the Franklin locality.
In Herring v. R. R., 189 N.C. at p. 290, citing numerous authorities, we find: "It is well settled law that railroad companies, in the conduct of their business, have a perfect right to make and promulgate reasonable rules and regulations. To be binding, they must be properly promulgated and in full force and effect — a living rule — and not revoked or abrogated by other inconsistent rules and regulations or orders. With knowledge or acquiescence of the master, either express or implied that they have been habitually violated, they are ordinarily regarded as a dead rule, waived, abrogated or revoked."
The Southern contended that it was not guilty of negligence and further that "on 10 December, 1927, Conductor McGee (of the Seaboard) phoned that Southern empty box car number 36859 was ready for movement, and that is all the information that I had at the time concerning the car. That was the regular way of notifying me, either by that or the agent. After I got that information I put it down on the record book and put it on the switch list to come out. I gave the directions to Conductor Yarborough as soon as he got in the office." Yarborough was the conductor of the train that ran into the crippled car while plaintiff was repairing it.
As heretofore shown, there was evidence by the contract between defendants that "equal rights with the other in and to the use of" the "exchange track," "so to be jointly owned and operated hereunder." The maintenance to be paid half by each. Then the responsibility between themselves for "injury" to "person" however resulting and "arising by reason of or in connection with the joint use by the parties hereto of the said tracks as aforesaid, shall be distributed as follows," etc. The responsibility for damages to employees by reason of concurrent negligence *Page 564 
"shall be borne by the parties hereto in equal contribution." There being evidence aliunde as to both defendants being joint tort-feasors, the evidence of one defendant was evidence against the other.
Mr. Justice Holmes in Union Pac. R. Co. v. Hadley, 246 U.S. 330, before quoted, says: "We must look at the situation as a practical unit, rather than inquire into a purely logical priority."
There was evidence to the effect that the Southern earlier than was customary went on the "exchange track" to get a car which, in the exercise of due care, it knew or ought to have known was being repaired and in making the repair plaintiff would of necessity be under the car; it gave no warning before picking up the crippled car, by ringing a bell or sounding a whistle; it coupled with unusual and unnecessary force; it did not, as was the custom, stop the train before coupling and a member of the crew get on the ground and look around and see if the car was ready to be moved; it had no right, under the Safety Appliance Act, to handle a crippled car. The Seaboard knew, or in the exercise of due care ought to have known, that the Southern car was crippled when it was put by it on the "exchange track" and the plaintiff would of necessity get under the car to repair it; it omitted and neglected to find out if it had been repaired and was ready to be hauled, but omitting this duty it owed plaintiff, the Seaboard agent telephoned the Southern that the empty car was ready for movement. The evidence was to the effect that the whole set-up was equal rights of the use of the "exchange track," between the Southern and the Seaboard — a "practical unit," the "joint use" under the contract. The evidence was also to the effect that the negligence of each of the defendants contributed to plaintiff's injury, and these negligent acts were the proximate causes that produced the injury, and both are liable as jointtort-feasors. The combined negligence of both produced the injury.
The Southern contended that plaintiff was employed alone by the Seaboard, but plaintiff's testimony is to the contrary, as follows: "On 10 December, 1927, I was employed by the Seaboard as car inspector and repairman at Franklin, Va. I was also working for the Southern as repairman; the Seaboard paid me."
On the record there was sufficient evidence of this fact, direct and circumstantial, at least enough to be submitted to the jury.
The Southern contended that the following charge was error: "In order, however, that a party may be liable for negligence, it is not necessary that he should have contemplated, or even been able to anticipate, the particular consequences which ensued, or the precise injury sustained by the plaintiff. It is sufficient, if by the exercise of reasonable care, the defendant might have foreseen that some injury would result from his acts or omissions, or that consequences of a generally *Page 565 
injurious nature might have been expected." We cannot so hold.
The general rule adopted in this jurisdiction is repeatedly sustained and thus stated in Hudson v. R. R., 176 N.C. at p. 492: "In support of the first two propositions the defendant relies on the definition of proximate cause, in Ramsbottom v. R. R., 138 N.C. 41, approved in Bowersv. R. R., 144 N.C. 686, and in Chancey v. R. R., 174 N.C. 351, as `A cause that produces the result in continuous sequence, and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen that such a result was probable under all the facts as they existed,' to which we adhere, with the modification contained in Drumv. Miller, 135 N.C. 204, and many other cases, that it is not required that the particular injury should be foreseen, and is sufficient if it could be reasonably anticipated that injury or harm might follow the wrongful act.'"
The charge above is taken from 21 A. E. Ency. Law (2d ed.), p. 487, quoted in the Hudson case, supra. The Hudson case was against the Seaboard and tried under Federal Employers' Liability Act. We think the decisions of the Federal Court sustain the charge.
In regard to the third issue: "Was the plaintiff engaged in interstate commerce at the time of his injury?" We think on the issue there was some evidence to be submitted to the jury, and the Seaboard's admission, the competency of this kind of evidence on the record has heretofore been gone into. The evidence being to the effect that both defendants were jointtort-feasors.
The Southern contends that the Safety Appliance Act had no bearing on the case. So far as the Southern was concerned, its acts in relation to contributing to plaintiff's injury was bottomed on other acts of negligence on its part and this aspect, if so applied to the Southern, is not prejudicial.
It may be that in the joint use of the "exchange track" by the defendants, the Southern knew, or in the exercise of due care ought to have known, of the crippled car, which amounted to evidence of negligence for coupling up and hauling the crippled car under the Safety Appliance Act, and it was one of the proximate causes of plaintiff's injury.
The Federal Employer's Liability Act, in clear language, says: "For such injury or death resulting in whole or in part, from the negligence of the carrier or its employees," etc. We find: "In Harton v. Tel. Co.,141 N.C. 455, the following statement of the law is quoted with approval: `To show that other causes concurred in producing or contributing to the result complained of is no defense to an action of negligence. There is, indeed, no rule better settled in this present connection than that the defendant's negligence, in order to render him liable, need not be the sole cause of the plaintiff's injuries. When two efficient *Page 566 
proximate causes contribute to an injury, if defendant's negligent act brought about one of such causes, he is liable.' See, also, 21 A. E. (2d ed.), 495 and note." White v. Realty Co., 182 N.C. at p. 537-8.
We do not think the exception and assignment of error as to the X-ray photograph can be sustained. The evidence, if competent, merely corroborated Dr. Vann, and, if error, is not prejudicial. This evidence was cumulative.
Among the many cases cited by defendants, we think the case, which both of the defendants relied on, Chesapeake Ohio Ry. Co. v. Mihas (decided by Supreme Court of U.S., 25 November, 1929), 280 U.S. 102, distinguishable from the present case, as the facts are different. In this action plaintiffs set forth many contentions as to the Southern's negligence and it is in evidence that "It was customary for the trains to come into the connection track and stop before coupling to the cars and for a member of the Southern crew to get down on the ground and look around the car and see if it was ready for the Southern to move it." In the Mihas case, at p. 106, we find: "The evidence, however, is that the notification or warning was exclusively for persons not employees engaged in unloading cars. There was no custom or duty of that kind in respect to employees engaged on or about the tracks. If there was a violation of duty, therefore, on the part of the railway company, it was not of a duty owing to Mihas; and the rule is well established that it is not sufficient for a complainant to show that he has been injured by the failure of another to perform a duty or obligation unless that duty or obligation was one owing to the complainant." This language in the Mihas case is consonant with the position here taken.
Taking the charge as a whole, we think the court below correctly instructed the jury as to the burden of proof on the different issues relative to the Southern, accurately defined negligence, contributory negligence, proximate cause, assumption of risk, and damages and applied the law applicable to the facts. We do not find any prejudicial or reversible error which would entitle the Southern to a new trial.
The questions involved in the trial of this action were mostly those of fact. The jury has found for plaintiff, in law we can find no prejudicial or reversible error that would warrant a new trial.
No error.
CONNOR, J., concurs in result. *Page 567