STACY, C.J., dissents.
SCHENCK, J., took no part in the consideration or decision of this case.
W. R. Pendry had been in the employ of the defendant for about twenty-two years. For several years he was a conductor and for sometime previous to his death, he was a flagman on a freight train. The deceased was killed on the night of 16 April, 1932. The facts surrounding his death were detailed by several witnesses. Daniels, the head brakeman, on the freight train, said: "The members of the crew . . . were Ramseur, conductor, Duggins, engineer, Armstrong, fireman, myself, and W. R. Pendry, flagman. The duties of the flagman are to assist the conductor and protect the rear of the train. No. 52 left Mooresville that night coming north at about 4:10 a.m. and reached Barber's Junction at about 4:40. About twenty or twenty-one cars made up the train from Mooresville to Barber's Junction. . . . When the train reached Barber's Junction I threw the west "Y" switch and we headed in the "Y." One car was set off on the storage track. . . . After switching that car the engine went up to what is known as the Park. When we went up to the Park we picked up some cars in the main leg, what is known as the main leg of the Park, and then came down and got some on the back track. . . . We picked up nineteen cars I believe. . . . We pulled them down here to this switch and we went up the main line and coupled on to the west end of it. I made that coupling. We then backed the cars and coupled up the cars we brought up from Mooresville. Pendry made that coupling. . . . *Page 876 
After Mr. Pendry made that coupling he went back to the rear of the train. I saw his light on the rear of the train. He was giving the backup signal on the north end of the caboose. . . . At the time the engine passed the switch from the old pass track into the west "Y" I was standing at the switch. . . . At the time Pendry made the coupling on the west "Y" and after the train had come to a standstill the engine was standing up on the old pass track about six or seven, maybe eight, car lengths up on the old pass track west of the switch from the old pass track into the west "Y." I was then three or four cars from the engine, and after the signal was given and the engine started to pick up, I dropped off of that car when it passed the switch. At the time the engine passed me when I was standing there at the switch, in my opinion, I would imagine he was going around five or six miles an hour, and went about a couple of car lengths from the switch before I caught the engine. After the engine passed over the switch I had to turn the switch. After the engine passed the switch and went the two car lengths, I can't be positive whether it stopped or not. He got down slow for me to get on. I couldn't say for certain whether he got plumb still or not but he got down slow. I imagine he was down to about a mile an hour, something like that. . . . They never did shut that engine plumb off at no time except when they stop; they are super-heated and they don't shut them plumb off. They are working steam even when working against the brakes; working steam unless they come to an absolute standstill. . . . At the time the engine passed me there at the switch, it had about the same gait until it got past me and then he slowed down some for me to get on. When it passed me and went up two car lengths and I caught the engine, he just backed on out on to the main line. I didn't see any signal from the rear end for him to continue backing. I was on the front end and couldn't see. . . . The rules of the company are that when backing into the main line from any siding, there is supposed to be a man on the rear whose duties are to look out and don't run over anybody or run into something, just to look out for the rear end in general. There is an air whistle on the rear of the train for him to blow in backing up. . . . In my opinion there is fifteen or twenty feet, around fifteen feet, of slack in a train of forty box cars. . . . The rules of the Southern Railway with reference to backing out of this particular west "Y" on to the main line are that a man must be on the back end of the platform and a chain goes across the drawhead, from one frame of the cab to the other. . . . The pipe from the whistle down to the air line of the caboose is three or four feet long and the whistle is just screwed into the pipe. . . . Nothing unusual happened to call my attention to the fact that he was stopping to pick me *Page 877 
up. I didn't hear him apply his brakes; couldn't have heard that because of the exhaust and steam from the engine and things blowing. I reckon it was around five-thirty that we left Barber's Junction. . . . After a train leaves a station and is on the main line, the flagman is supposed to ride the caboose and the conductor rides about anywhere he wants to, but usually rides the caboose. . . . The first time I knew that Mr. Pendry was not on the train was when we got back to the roundhouse or the coal chute. The conductor asked me had I seen Pendry. I told him I hadn't. He said we left him at Barber's; that he wasn't on the cab and hadn't been on since we left Barber's."
When the train arrived at Winston-Salem and it was discovered that Pendry was missing a message was sent to Barber's Junction in order to locate him. Hill, a telegraph operator at Barber's Junction, stated that he received a message from Winston inquiring about Pendry, and that in response to such message he went around the west "Y" and found the body of the deceased. He said: "The body was about ten or twelve rail lengths from the point of switch of the Mooresville main line. . . . When we found the body he was lying on his back, face up. . . . The left leg was cut off with a bone sticking out several inches. . . . We didn't find anything lying around him, but as we went to the body we found things along the track. . . . I noticed signs of something having been dragged along the track like a bag of meal dragging along there. The dragging showed for a distance of about fifty or seventy-five yards. Further down we found his pistol. . . . I think we found the pistol first and then his pocketbook and his watch, and a shoe and a whistle off the back of the cab. . . . The pistol was lying between the rails with the hammer cocked. . . . The warning whistle is the very last thing on the rear of the cab, sticking out. . . . I didn't pay very much attention to the whistle we found there, but it appeared like it had been broken, like it had been screwed, part of it, out and then suddenly broken off."
Ramseur, the conductor, said: "When I left, Pendry was on the rear of the car to make the coupling. I didn't see him any more after he made that coupling. I instructed him to make the coupling and to go back and protect the rear of the train, and so far as I know he went on back there. I did not signal the engineer ahead after he got water. He did pull ahead and I caught the caboose along about the water tank. When I got in the cab I didn't see Mr. Pendry. . . . When I got on the caboose I saw Pendry's lantern and brake stick that he used up in the Park. . . . His lantern was sitting in a cane bottom chair that was in the caboose; it was an old chair that had been laying down in the caboose for some time and it was laying down when we pulled in there that morning. The lantern was sitting down in the *Page 878 
rounds of the chair. . . . There were no lanterns or chairs turned over in the caboose. The track stick was lying up on the end of the chair."
Plaintiff offered the testimony of Pugh, Morris, Surratt and Griffin, who testified that they were experienced in the operation and stopping of freight trains. In a general way these witnesses testified that if the engine of this particular train had slowed down from five or six miles to one mile an hour within a distance of two car lengths that in their opinion such operation would cause an unusual or violent jerk upon the rear of the train or the caboose where the deceased was supposed to be. These witnesses all said that the violence of the jerk upon the rear of a forty-car freight train would depend upon how the engineer undertook to make the stop or slowing down process; and furthermore, that the condition of the weather and of the track and various other elements would constitute factors in the operation.
At the conclusion of the evidence the trial judge struck out the opinion evidence and nonsuited the case, and the plaintiff appealed.
W. R. Pendry had been in the employ of the defendant for twenty-two years, serving as conductor and flagman for a freight train, and was an experienced trainman and thoroughly acquainted with switching operations at Barber's Junction and elsewhere along the line. On the night of 16 April he was a flagman on a freight train bound for Winston-Salem. The train crew consisted of Ramseur, conductor, Duggins, engineer, Armstrong, fireman, and Daniels, head brakeman. When the train arrived at Barber's Junction at about four-forty in the morning it became necessary to perform a switching operation. The engine was pulling twenty-one cars into Barber's Junction. One of these cars was set off on a storage track. Leaving the twenty cars, the engine moved to the Park and picked up nineteen cars. Then the engine backed into the "Y" and "coupled up" to the twenty cars originally in the train. Pendry made that coupling. About eight o'clock on the morning of 17 April, 1932, the mangled body of Pendry was found about ten or twelve rail lengths from the point of the switch of the Mooresville main line. The body was "face up." The left leg was cut off. "There were signs of something heavy having been dragged along the track a distance of fifty or seventy-five yards." A short distance from the body down the track was a pistol of the deceased "with the hammer cocked." *Page 879 
"His watch was between the body and the pistol." Farther on, the brass whistle on the back of the caboose was found. "It appeared like it had been broken, like it had screwed part of it out, and then suddenly broken off." Pendry was last seen alive when he made the coupling and went back to the rear of the train. "He was giving the back-up signal on the north end of the caboose." When the train pulled out on its journey the conductor went into the caboose and saw Pendry's lantern sitting in the rounds of an old chair that was lying down in the caboose. His brake stick was lying on the end of the chair. Nothing was disturbed or turned over in the caboose. After Pendry made the coupling the conductor had instructed him "to go back and protect the rear of the train." The rules of the defendant did not require the "flagman to use the whistle when the train is backing up, but it is there and can be used for such purpose." But the rules with reference to backing at the west "Y" were to the effect that a man "would ride the rear of the train backing out of the west `Y' at Barber's."
There was opinion evidence from men experienced in the operation of freight trains to the effect that reducing the speed of the engine under the circumstances from five or six miles an hour to one mile within a distance of two car lengths would produce an unusual and violent jerk at the end of the train or caboose.
The foregoing word-picture produces the paramount question of law involved in the case, to wit: Was there evidence of negligence on the part of the defendant and that such negligence was the proximate cause of the death of Pendry?
In arriving at a solution of the legal problem presented three preliminary observations are pertinent:
1. "It having been admitted that plaintiff's intestate was engaged in interstate commerce at the time of his death, it necessarily follows that the liability of the defendant must be determined solely by the Federal Employers' Liability Act as construed and applied by the courts of the United States." Wolfe v. R. R., 199 N.C. 613, 155 S.E. 459.
2. The scintilla rule has been definitely and repeatedly rejected so far as the Federal Courts are concerned. Penn. R. R. Co. v. Chamberlain,288 U.S. 333.
3. The principle of res ipsa loquitur has no application. This doctrine permits and warrants an inference of negligence from facts. It has never been extended far enough to supply or create necessary facts, and, in addition, draw an inference from such vital facts so created. See Springsv. Doll, 197 N.C. 240, 148 S.E. 251.
The only evidence of negligence disclosed by the record consists of the opinion testimony of certain trainmen that the reduction of the speed of the train when it was backing from five or six miles an hour *Page 880 
to one mile an hour within a distance of two car lengths, would tend to produce an unusual and violent jerk of the rear of the train or caboose. The operation of a freight train is not a sight-seeing tour. It is a rough process, under most favorable conditions, and attended with many unavoidable perils which are well known to every experienced trainman. Notwithstanding, "it is recognized in both jurisdictions that railroad companies in the operation of their freight trains are held to a high standard of care reasonably commensurate with the risks and dangers usually attendant upon the work, and although negligence may not be inferred from the ordinary jolts and jars incident to their operation, it may be imputed where there has been a `sudden, unusual, and unnecessary stopping of such trains, likely to and which do result in serious and substantial injuries to employees or passengers thereon.'" Hamilton v. R. R., 200 N.C. 543,158 S.E. 75.
The plaintiff contends that after making the coupling, Pendry walked back to the north end of the caboose and gave the backing-up signal to the engineer, and that he then went into the caboose, set down his lantern and brake stick, and went out on the rear platform of the caboose to blow the whistle while the train was backing, and that, while standing there in the line of his duty and in obedience to the rules of the defendant, a sudden, violent, unusual and unnecessary jerk was given the train and the deceased was thereby thrown off the rear of the platform beneath the wheels of the backing train, carrying the whistle with him as he fell to his death.
The defendant asserts that there was no unusual jerk or movement of the train, and that, while certain trainmen, who were not present and knew nothing about the actual facts and circumstances, testified that in their opinion there was an unusual jerk, nevertheless Daniels, the head brakeman, who was present and a witness for the plaintiff, said: "Nothing unusual happened to call my attention to the fact that he was stopping to pick me up."
The opinion testimony, stricken out by the trial judge, relating to the effect of an alleged sudden reduction of the speed of the train upon the rear end or caboose, was competent. It is the function of the jury to weigh it and say what it is worth. Wilkinson v. Dunbar, 149 N.C. 20,62 S.E. 748; Richardson v. Woodruff, 178 N.C. 46, 100 S.E. 173. Assuming, however, that there was more than a scintilla of evidence of an unusual jerk of the train, was such jerk the proximate cause of the death of Pendry? Where was Pendry at the time the jerk came? His lantern and brake stick were in the caboose. No one saw him on the rear of the platform. Had he fallen from the train before the jerk? *Page 881 
The general rule of law in determining liability in the Federal Courts is stated in Atchison, Topeka Santa Fe Railway Company v. Toops, Admr.,281 U.S. 351, 74 L.Ed., 896, as follows: "But proof of negligence alone does not entitle the plaintiff to recover under the Federal Employers' Liability Act. The negligence complained of must be the cause of the injury. The jury may not be permitted to speculate as to its cause, and the case must be withdrawn from its consideration unless there is evidence from which the inference may reasonably be drawn that the injury suffered was caused by the negligent act of the employer. . . . Even though we assume that in all the respects alleged the petitioner was negligent, the record does not disclose any facts tending to show that the negligence was the cause of the injury and death. . . . What actually took place can only be surmised. Whether he was run down on the track by the first car or he attempted unsuccessfully to board the train on one side or the other or succeeded and in either case finally came to his death by falling under or between the moving cars is a matter of guesswork." To like effect is the statement of law in New York Central R. R. Co. v. Ambrose, 280 U.S. 486,74 L.Ed., 562, as follows: "The fact of accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employe to establish that the employer has been guilty of negligence — the evidence must point to the fact that he was. And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employe is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs."
In the case at bar the conductor had directed the deceased to look after the rear of the train. The rules of the company required that he should be on the rear of the train in a "backing-up" operation. The law assumes that an employee will obey the rules, nothing else appearing, and that he will exercise in the absence of proof to the contrary, due care for his own safety. He was last seen alive on the caboose when he gave the signal. He had been inside the caboose to set down the lantern and brake stick, and, under the circumstances, it would seem more reasonable to infer that in executing the orders of his superior and in obedience to the rules of his employer, he proceeded *Page 882 
to the rear of the caboose. Such inference, however, is not binding upon a jury when the jurors are called upon to find the facts fairly and reasonably in the light of all the testimony. In other words, was Pendry on the rear of the train? Was there an "unusual, violent and unnecessary" jerk of the train that threw him off to his death? These are controverted questions.
However, the Court is of the opinion that there was sufficient evidence to be submitted to the jury within the contemplation of the Federal rule.
Reversed.
STACY, C.J., dissents.
SCHENCK, J., took no part in the consideration or decision of this case.